## ELECTRIC LIGHT POLE IN STREET.

[Circuit Court of Huron County.]

CITY OF NORWALK v. JESSIE JACOBS.

Decided, November 17, 1906.

*Negligence—Questions as to—Where Horse Shied against Electric Light Pole in Street—And Occupants of Vehicle were Injured—Municipal Corporations—Streets—Nuisance—Runaway and Frightened Horses —Proximate Cause—Charge of Court.*

1. A municipality is bound to keep its streets in repair and free from nuisance both as to the width of the street and freedom from obstructions in the line of travel; but it is only bound to keep them in such condition as to render them safe for ordinary travel, as distinguished from an extraordinary emergency such as riding behind a frightened horse or a horse beyond the control of its driver.

2. A municipality has the right to determine the width of its streets which shall be devoted to lawful public uses, devoting a part to sidewalks, a part to lawn and shade trees, a part to necessary poles for public lighting, etc., a part to drainage, gutters, etc., and a' part to vehicles and street cars; and it is not an unlawful use if that part of a street which is usually devoted to drainage be occupied in part by poles supporting street lights.

W. R. Pruner, A. V. Andrews and J. R. McKnight, cited for the plaintiff in error:

As to obstructions in margin of street—*Village of Rankin* v. *Smith*, 63 Ill. App., 522; Jones on Negligence of Mun. Corp., 146; Williams, Mun. Torts, 134, 142; 2 Dillon, Mun. Corp., Sections 1008, 1024.

A municipality acts in its delegated governmental capacity in determining what part of a street.shall be improved—*Ely* v. *St. Louis* (*Mo.*), 81 S. W. Rep., 168; *House* v. *Covington* (*Ky.*), 82 S. W. Rep., 347.

One who travels outside of an improved way of reasonable width does so at his own risk—*Orr* v. *Oldtown* (*Me.*), 58 Atl. Rep., 948; *Hutchinson* v. *Clarke* (*R. I.*), 58 Atl. Rep., 948; *Lynch* v. *Boston* (*Mass.*), 71 N. E. Rep., 301; *Roberts* v. *Telephone Co.*, 77 Wis., 589; *Allen* v. *Telegraph Co.*, 21 Hun., 22;

*Sheffield* v. *Telephone Co.*, 36 Fed. Rep., 164; *Cincinnati* v. *Fleisher*, 63 O. S., 229; *Elster* v. *Springfield*, 49 O. S., 82.

Accidents from runaway or frightened horses—*Monahan* v. *Telephone Co.*, 7 N. P., 95; *Hungerman* v. *Wheeling (City)*, 46 W. Va., 761; Tiedeman, Mun. Corp., Sec. 342; 3 Abbott, Mun. Corp., 2280; *Cole* v. *Newburgport*, 129 Mass., 594; Smith, Mun. Corp., 817, Sec. 810; *Titus* v. *Northbridge*, 97 Mass., 258; 2 Dillon, Mun. Corp., 1035; *Schillinger* v. *Verona*, 96 Wis., 456; *Higgins* v. *Boston*, 148 Mass., 484; *Ehleiter* v. *Milwaukee*, 121 Mich., 85; *Jackson* v. *Bellevieu*, 30 Wis., 250; *Moss* v. *Burlington*, 60 Iowa, 438; *Bell* v. *Wayne (Vil.)*, 123 Mich., 386; *Pittsburg St. Ry.* v. *Taylor*, 104 Pa. St., 306; *Cushing* v. *Bedford*, 125 Mass., 526; *Perkins* v. *Fayette*, 68 Me., 152; *Davis* v. *Dudley*, 86 Mass. (4 Allen), 557; *Palmer* v. *Andover*, 56 Mass. (2 Cush.), 600; *Fogg* v. *Nahant*, 98 Mass., 578; *Winship* v. *Enfield*, 42 N. H., 107; *Dubois* v. *Kingston*, 102 N. Y., 219; *Ring* v. *Cohoes*, 77 N. Y., 83; *Macamber* v. *Taunton*, 100 Mass., 255; *Cushing* v. *Boston*, 128 Mass., 330; Smith, Mun. Corp., Secs. 1, 310, p. 1364; *Dubois* v. *Kingston*, 102 N. Y., 219; *Ring* v. *Cohoes*, 73 N. Y., 83; *Macomber* v. *Taunton*, 100 Mass., 255; *Dougherty* v. *Horseheads Vil.*, 159 N. Y., 154; 3 Abbott, Mun. Corp., 2293; *Frostburg* v. *Wineland*, 98 Md., 239.

Necessary objects and articles in streets—Williams, Municipal Liability for Tort, 149; 2 Dillon, Mun. Corp., 694; 3 Abbott, Mun. Corp., Sec. 1004.

Electric light poles are proper in street—*Roberts* v. *Telephone Co.*, 77 Wis., 589; *Palmer* v. *Electric Co.*, 158 N. Y., 231; Joyce, Electric Law, 328, 329, and notes.

Notice—*Denver* v. *Sherret*, 88 Fed. Rep., 226; *Fehrman* v. *Pine River*, 118 Wis., 150; *Downs* v. *Smyrna Town*, 45 Atl. Rep., 717; *Buckley* v. *Kansas City*, 56 S. W. Rep., 319; Smith, Mun. Corp., Secs. 1210, 1310.

A city is required to exercise ordinary care and diligence to keep its streets in a reasonably safe condition for the ordinary travel of those who have occasion to use them by day or night— *Beattie* v. *Detroit*, 137 Mich., 319; *Moreton* v. *St. Anthony*, 75 Pac. Rep., 262; Elliot, Streets, Secs. 615, 621; *Moriarty* v. *Lewiston*, 98 Me., 482; Williams, Municipal Torts, 171, 173, 183.

PARKER, J.; HAYNES, J., and WILDMAN, J., concur.

Heard on error to the Common Pleas Court of Huron County.

This case below was an action by Jessie Jacobs against the city of Norwalk to recover damages for injuries she alleges she sustained by reason of the negligence of the city in allowing a certain electric light pole to be erected and maintained upon one of the streets of the city. She recovered a judgment for $2,000. This was the second trial of the case in the court of common pleas. Upon the first trial the judge charged the jury in effect that, if the pole was set beyond the curb line into the street, that would amount to negligence, *per se,* upon the part of the city.

Judgment was obtained by Mrs. Jacobs; error was prosecuted to this court and we reversed that judgment, holding that the court erred in that charge. The opinion by Judge Haynes will be found in *Norwalk* v. *Jacobs,* 7 C. C.—N. S., 229. This last clause of the syllabus states that point:

"Whether or not such a pole is dangerous to the public or a nuisance is a question for the jury, to be determined under proper instructions from the court and all the circumstances of the case."

I notice that throughout the case as here reported, the pole is described as a telephone pole; but it turns out, whatever the record may have shown before, that it was in fact a pole erected to support an electric light used in lighting the street; but that perhaps would not alter the legal principles materially.

In the course of the opinion, Judge Haynes says at the bottom of page 231:

"I have very serious doubts myself whether that pole was in a position where it could be said to be in a dangerous condition, or to be said to be a nuisance."

It is contended here on behalf of the city that the power and discretion of fixing the width of streets and of permitting the erection of poles along in the streets, etc., is vested in the city council, and that whether the city has been negligent in this respect in any instance, is not a question to be submitted to the jury; that their action is not to be revised by a jury. We think that is stating the rights and authority of the city too

broadly; that it was fairly stated in the syllabus that I have read. In the first instance, the power and authority is vested in the city; but since the statute has not fixed definitely the width which shall be maintained for public travel in the streets, and has not fixed definitely locations at which electric light poles, or telephone or telegraph poles, shade trees and other structures along streets, shall be placed, manifestly, in any given instance where it is claimed they have not been properly placed, the question must be submitted to the court—in a jury case, in the first instance to the jury, and if the finding of the jury is not satisfactory to the party, as in this case it is not to the municipality, then the matter may be reviewed by the courts placed above the trial court for that purpose. Here it is urged that even if the jury may pass upon a question of this kind, the verdict is manifestly against the weight of the evidence, and it is also claimed that errors occurred upon the trial which require a reversal of the judgment.

The case appears to have been very carefully tried, and all the witnesses who could throw any light upon the question, appear to have been called and examined very fully, and all the information that could be laid before the jury, was produced and brought to their attention; and the court appears to have exercised great care in charging the jury and in defining the rights of the parties; but it is urged, as I have said, that the judgment is fundamentally wrong because against the weight of the evidence; that the evidence does not disclose, when fairly weighed and considered, that the city in this case was guilty of negligence.

The facts are recited in the opinion to which I have referred, but I will in a general way repeat, and perhaps add somewhat to the statement. The plaintiff, while riding in a buggy toward the eastward on the Main street of this city, was thrown from the buggy and suffered a broken limb and other injuries, and it is conceded that if there is liability upon the part of the city, the verdict for $2,000 on account of those injuries is not excessive. She claims that she was not thrown from the buggy and injured through any fault of her own, but solely through the fault of the city in allowing this electric light pole to be placed so far within the roadway as that it was dangerous and a

nuisance to those using the street for public travel; and that it was not only placed so far within the street as to make it dangerous, but it leaned toward the center of the street in such a way as to make it even more dangerous.

The accident happened about midday. In the buggy with the plaintiff was her niece, a young lady, her brother, a young man, or boy, about fifteen years old at the time, a child about eight years old, the child of the plaintiff, and another child, a babe of the plaintiff. It was a covered buggy with a single seat and drawn by one horse. The plaintiff sat upon the left side holding the eight year old child in her lap; her niece sat upon the right side holding the babe in her lap, and the boy, her brother, who was driving, sat between them. The buggy was not a new buggy, nor does it appear to have been an old and dilapidated buggy, but one apparently in fairly good condition.

The part of the street where it is said the accident occurred, is about a mile and a half east from the center of the city and near the eastern city line—near a point called Alling's corners. The street has great width and is well paved about half the distance from the center to the point where the accident occurred, or to point where there is an overhead bridge over the railroad. Beyond this point, it is not and was not paved. The accident happened in 1898, in May. Beyond and to the east of this overhead bridge, the roadway is considerably narrower than it is west of that point. There are shade trees on either side of the road, between the place where the sidewalk would ordinarily be located, and the roadway—a great many shade trees, a continuing row of shade trees upon either side, some of them quite large—and near to the line of the shade trees are numerous poles erected for electric lights and for telephone wires and some electric railroad poles.

There is a railroad track for an electric railroad running through the street and located near its center; it is used for city cars and also for interurban cars, and was at that time. The street had been graded at this point, and some time before the laying of the electric railroad, it had been macadamized at the center of the driveway; at this point and for some distance to the east and west of it, the width of the roadway

as graded and improved for travel, to a width varying from thirty to thirty-four feet. Along about where this accident occurred, the railroad was laid a little to the northward of the center of the street, so that the width for vehicles was slightly less upon the north side of the railroad track than it was upon the south side. For some distance east and also west of this point, the width appears to have been from eleven feet six inches to fifteen feet between the north rail of the track and the portion that was sodded at the side of the road beyond where it was worked. There was no curb set except in front of a few premises, where the proprietors appear to have set curbs on their own account; so that the roadway, designed for vehicles as I have said, varied between eleven feet six inches and perhaps fifteen feet.

This particular pole was set either twelve feet four inches or twelve feet nine inches (witnesses differing about this), from the north line of the railroad; in other words, there was that distance between the north edge of the north rail and the south side of the pole; and the pole had some inclination toward the south— just how much, we are unable to determine from the evidence.

The roadway was in good condition and practically level, though it was somewhat crowning, having an elevation of six inches more at the center than at the north edge of the worked part of the road.

The evidence shows that while the plaintiff was traveling eastward on this occasion, her brother driving, they met a city car perhaps sixty or seventy feet west of this pole, and, the plaintiff and those with her being upon the north side of the track, as the car was passing toward the west, the horse shied away from the car toward the left and some part of the buggy came in contact with this pole, so that the top and seat of the buggy were detached from the box and fell over upon the ground, and all the occupants of the buggy were thrown out, some of them appearing to go against the pole, some falling to the south and east of the pole, and the plaintiff and her oldest child falling to the west and north of the pole.

They had passed the cars on other occasions on this same trip and the horse had shown no fright or disposition to shy away from the car; but on this occasion, as the plaintiff testi-

fies, the horse shied to such an extent that when they were a short distance from the pole—perhaps within ten or twelve feet of it—the horse appeared to be going directly toward the pole, so that the plaintiff was fearful that the horse itself would come in contact with the pole; then the horse appears to have taken a turn, whether guided by the lines or by its own motion, toward the center of the road, toward the traveled track, and then the plaintiff became fearful that the buggy would strike the pole, as it did.

There is a dispute, and it is not certain from the evidence how it should be settled, whether the buggy top was the part of the buggy which first came in contact with the pole, or whether it was some part of the running gear of the buggy. The evidence tends to show, and we think does show very clearly, that this pole did not have enough of an inclination toward the south so that a buggy going along in the ordinary way, no matter how closely it came to the pole, if the hubs of the buggy should miss, would be obstructed or caught in its top by the overhanging of the pole.

The testimony on behalf of the plaintiff tends to show that the pole had a lean in a height of thirty feet of about forty inches, and the evidence shows clearly that in order to have enough of a lean so that the pole would miss the hub of the buggy standing upright and striking its top it must have had a lean of about seven feet; nevertheless, it does not appear but that the buggy, swinging somewhat from side to side, as buggies will swing in motion, and especially a buggy loaded somewhat heavier upon the north side than upon the south, as this buggy may have been, and one which is being carried along swiftly by a frightened horse, and one which has taken a northwesterly direction and then is suddenly turned in a southeasterly direction, might not so lurch and careen as that the top of the buggy would catch a pole having the lean that this pole had, or even a pole standing perpendicularly; so that we are unable to say from the evidence with certainty that the top of the buggy was not the first part of the buggy that came in contact with the pole. Because of the buggy's having become detached from the horse at the pole, and the top thereof having been thrown from the buggy toward the north, rather

than dragged from the buggy, which would have a tendency to push it toward the west and southward, the testimony tends very strongly to show that the front part of the running gear of the buggy first came in contact with the pole; and that part would not come in contact with the pole before the top had gone far enough to the eastward to pass the pole.

There is some difference in the testimony of witnesses as to the line between the worked part and the sodded part of the street—the line between the two sometimes described as the curb line, though there was no curb set at that point. Some of the witnesses testify that this line was near the south side of the pole; others, that it came near the center of the pole, and that it was curved around the pole toward the north in order to let the water flow by the pole. Others testify that it was a comparatively straight line, and that it ran anywhere from six to seven inches to the north of the pole. At this point, the difference in elevation between the worked part of the street and the sodded part where the trees stood, beyond what has been mentioned as the curb line, was inconsiderable—but a few inches.

As I have already said, this pole stood, according to the testimony, at least twelve feet four inches from the north rail. The extreme width of the buggy appears to be five feet and eight inches to the end of the hubs. This allowed what may be termed leeway between the railroad and the pole of nearly seven feet. This would be reduced somewhat, of course, if a car were passing the pole at the same time a buggy were passing. On this occasion, however, the buggy and the car passed at a point some distance to the west of the pole. I think it is fair to say that the great weight of the evidence tends to show that that was true—that the horse shied just as the car was passing and that this was at a point at the west side of the vacant lot at the west of Mr. King's premises, or at the line between the vacant lot and the Meyers property, which was fifty or sixty feet at least west of the pole.

The collision occurred after the horse had traversed a distance of perhaps fifty or sixty feet after it shied; when the horse was swinging back to the south and into the road, as described by the plaintiff and her witnesses, it was not traveling

toward the car, but the car had passed that point, and there was open to them over twelve feet between the pole and the north rail of the track. But even with the car at the same point, there would be nearly seven feet of space, or rather, even with the car at the same point, there would be in the neighborhood of five feet of leeway between the car on the one side and the pole on the other, over the width of the buggy.

The plaintiff testifies that the horse was traveling along the middle of the roadway lying between the railroad track and the curb line when it shied. The traveled track appeared to be in about that location and not very close to the pole.

. It is quite evident that this accident would not have happened—this buggy would not have come in contact with the pole—but for the shying of the horse, and that is so whether the running gears of the buggy or the top of the buggy first struck the pole.

The case was submitted to the jury by the trial judge in such a way as that they might find liability upon the part of the city, even though the pole stood perpendicular, or with so little lean toward the south that the lean of the pole would not add to the danger of its location at that point; in other words, so that there might be a finding against the city simply upon the ground that the pole was located so far into the street and that it was such an obstruction to travel as to make it a nuisance and make the city liable for an accident like this.

A majority of this court are of the opinion that this was wrong; we are of the opinion, as I have already stated, that a verdict can not be sustained upon the theory that it was the lean of the pole that caused the accident; and we are further of the opinion that a finding, and a verdict based thereon, that the location of the pole and permitting its maintenance at that point was negligence upon the part of the city, was not sustained by the evidence; for, while this matter is to be committed in the first instance to the council, and then in case of difference, to a jury and trial court, ultimately, when it is submitted to a reviewing court upon the question of the weight of the evidence, it becomes necessary for that court to consider and decide that question, and, in the light of all the evidence as to the width of the roadway at that point, the location of the

pole and the way the accident happened, we conclude that
the evidence will not support a finding that the city was neg-
ligent in placing a pole at this distance from the railroad track;
that is to say, upon a street of this character where the widths
provided for vehicles range between eleven feet six inches and
fifteen feet, and where there was no regular and well defined
curb line, where it was away from the center of the city, at a
place where there was not much travel and many teams pass-
ing, and where there is an absence of evidence that there was
anything about the curb line or about the situation that misled
the parties who were driving, so that they deviated from the
track, or took a course which brought then unexpectedly against
the pole. It all happened in the daylight; the way was open
to their view, and it was not because of their being misled in
their course by the situation and surroundings, but because of
the shying of the horse that the collision and the accident oc-
curred.

MR. YOUNG: Does the court mean to say that if the matter
had been submitted upon the leaning of the pole and the jury
had found for the plaintiff, that that would not have been sus-
tained by the evidence?

COURT: Yes, sir, we think the evidence does not show that
degree of leaning of the pole that would support a verdict
based on that condition.

On behalf of the city, counsel asked the court to charge the
jury before argument as follows:

"A city has the right to determine the width of its streets
which shall be devoted to lawful public uses; it may devote a
part of the width to sidewalks, a part to lawns and shade trees,
a part to necessary poles for public lighting, a part to drainage,
gutters and ditches, and a part to vehicles and street cars. All
these are lawful uses. If the part designed for drainage be
partially devoted to poles for lighting, this is not an unlaw-
ful use or a negligent act in itself, and unless such poles so
overhang the part of the street ordinarily used for travel or
so far project into it as to render them dangerous to persons
using said streets for ordinary travel, it is not a negligent act
to permit such poles to so remain in the ditch or gutter."

We think this should have been given whether the place where
this pole was set was distinctly a ditch or gutter or not, be-

cause there was evidence tending to show it was not a part of the road designed for the tracking of vehicles, or of the graded portion which would naturally be devoted to and used for travel, but was designed and used for the carrying away of the water falling upon the street.

In view of the fact that there was evidence tending to show that (and that was a part of the claim of the city with respect to that part of the road), we think that should have been given, or that the substance of that should have been given in some form to the jury; but we do not find that that was given in substance by the trial judge.

In the course of its charge to the jury, the court said this, which we think, so far as it goes, is correct, though it is not complete in that it does not cover the point involved in the request just considered:

"In determining, therefore, from the evidence in this case, whether or not the pole referred to in the petition was so placed or maintained as to be dangerous or a nuisance, you will consider the ordinary width of vehicles in general use at that place, the width of the street, the distance from this pole to the railroad track, the width of the roadway left for use by travelers with vehicles, the condition and grade of the street, the location, size and condition of the pole; whether it was perpendicular or inclined, and if inclined, how much; whether it was or was not inside the traveled part of the street; whether it did or did not interfere with the ordinary use of the street by travelers with ordinary vehicles known to be in common use at the time, and if so, to what extent; whether there was or was not any curb at that place; whether there was or was not any sidewalk along this street at that place; whether the railroad tracks were at or above grade; whether the said tracks were or were not in such condition as to be reasonably fit for the passage of vehicles drawn by horses across them; what, if any, space existed in the street to the north of the line of poles, and whether the same was or was not reasonably suitable for horses with ordinary vehicles to be driven over; the distance of that place from the business portion of the city, the extent of travel at that place; whether or not there were trees growing on or along the highway in that locality, their number, if any, and location and character—you will consider all these matters and all other facts and circumstances in evidence throwing light on the question, and say from them all, whether this pole was or was not dangerous, or a nuisance.

"I have said to you in substance that it was the duty of the city to use ordinary care to see that the company erecting and maintaining this pole did not by its negligence make this street unsafe for travelers thereon who were themselves using ordinary care and prudence. The city is held to the use of ordinary care in exercising a general supervisory duty. The city is not an insurer of the safe condition of its streets, but it is only held to the exercise of ordinary care over them. If the pole was in the street and dangerous, or a nuisance, in the manner alleged in the petition, and under the rules I give you, and if the horse was of ordinary gentleness and became frightened at an electric car and shied and got beyond the control of the driver and ran away and the buggy came in contact with the pole whereby the plaintiff was injured as alleged, and if the defendant through its officers charged with the care of its streets had actual knowledge of such condition for a reasonably sufficient time to have the condition remedied; or, if in the exercise of ordinary care, the city should have had such knowledge for such time and failed to have the condition remedied, the defendant was negligent and became liable for any injuries to the plaintiff, directly resulting therefrom, provided the injury would not have been sustained but for such pole so erected. If, however, the pole was not dangerous nor a nuisance, then under the circumstances stated, the defendant would not be liable."

We think that should be qualified to this extent:

The city is bound to keep its streets in repair and free from nuisance; but, as we understand the law, it is only bound to keep them in such condition as to make them safe for ordinary travel; not safe for extraordinary emergencies; it is not bound to keep the streets so smooth and so level and so well paved as that one may speed his horses upon them; may run races with their horses upon the streets with entire safety; it need not have the streets smooth and level and wide as to make such a course safe; nor need they be made so wide and so smooth and level and free from ruts or obstructions or hindrances that they would be safe for one riding behind a runaway horse or a horse beyond control. It is only for ordinary travel. Neither is the city required to make the streets so wide, so smooth and level and free from nuisance or obstructions that an unmanageable horse or a horse shying and leaving the roadway or the track, refusing to be guided by its master, could be driven

thereon with safety, so that, if the horse should shy and leave
its proper course the road would be safe for such an emergency.
We think it should be made safe for ordinary travel, and for
horses that are broken for ordinary travel, and that leaving
such a space as was left here between the pole and the track,
or between the pole and a car, was as much as could be required
of the city under the law.

A municipality may allow street cars to be run upon its
streets, and people who drive horses that will shy at street
cars, where they are left ample room for safe and well-broken
horses to travel, must take the risk themselves, and they can
not hold the city responsible for an accident occurring through
the shying of their horses at street cars, where they voluntarily
drive along past them and where they are in operation.

Mr. Young: Supposing it is shown that a horse is ordinarily
gentle and not accustomed to shy, but for some reason on some
special occasion, should shy—a horse that perhaps was never
known to shy before?

Court: That goes to the question of contributory negligence.
If a horse was never known to shy before and shied on this
occasion, it could not be said that the party riding behind
the horse was guilty of contributory negligence; but we do
not place this decision upon the ground of contributory negli-
gence, but upon the theory that they city itself was not guilty of
negligence; that the city itself was not bound in the first in-
stance to make provision for shying horses; otherwise there
would be no limit—no reasonable limit—to the width that
might be required of the city; for while some horses might
shy a little, going out a few feet, others might shy and go out
a great deal further; and for horses that shy or act otherwise so as
to become unmanageable and not keep the roadway, there is
no reasonable limit of width that could be fixed for the street.
For the reasons expressed, the judgment of the court below
must be reversed.

If it were in our power to make a special finding of fact we
would gladly do it so that a retrial might be avoided; but we
think the precise question involved can not be presented to the
Supreme Court without a special finding of fact by a jury, and
the case will be remanded in order that that may be done.

*W. R. Pruner, A. V. Andrews* and *J. R. McKnight,* for plaintiff in error.

*S. M. Young,* for defendant in error.